```
         IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                 FAYETTEVILLE DIVISION

CURTIS J. NEELEY, JR.                                PLAINTIFF

            v.           Civil No. 09-5151

NAMEMEDIA, INC., NETWORK
SOLUTIONS, INC.; and
GOOGLE INC.                                         DEFENDANTS
```

## O R D E R

Now on this 7th day of June, 2011, come on for consideration **Google Inc.'s Motion For Summary Judgment** (document #236), and NameMedia, Inc.'s **Motion For Partial Summary Judgment** (document #249), and from said motions, and the responses thereto, the Court finds and orders as follows:

1. Plaintiff Curtis Neeley ("Neeley") alleges that defendants NameMedia, Inc. ("NameMedia") and Google Inc. ("Google") violated his trademark rights. His contention is that NameMedia registered two internet domain names, eartheye.com and sleepspot.com, and licensed them to Google, in violation of the anti-cybersquatting provisions of **15 U.S.C. § 1125(d)**. Neeley further alleges that NameMedia and Google conspired to cybersquat the two domain names. This conduct is said to violate his trademark rights.[1]

Neeley also alleges, as against Google, a claim for intentional infliction of emotional distress under Arkansas law.

NameMedia asserted a Counterclaim against Neeley under

---
[1] Neeley's claims against defendant Network Solutions, Inc., were dismissed with prejudice on May 20, 2010.

**§ 1125(d).**

Both defendants now move for summary judgment on Neeley's claims against them. The motions are fully briefed and ripe for decision.

2. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States, 31 F.3d 696 (8th Cir. 1994).** Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. **Hardin v. Hussmann Corp., 45 F.3d 262 (8th Cir. 1995).** The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. **City of Mt. Pleasant, Iowa v. Associated Electric Co-op, Inc., 838 F.2d 268 (8th Cir. 1988).**

3. Pursuant to **Local Rule 56.1**, Google and NameMedia filed statements of facts which they contend are not in dispute. Disregarding those to which Neeley objected, the Court finds the following facts are undisputed:

* Neeley first registered the domain name eartheye.com on April 17, 1997.

* NameMedia registered eartheye.com on July 2, 2003. At that time, Neeley's registration of this domain name had expired.

* Neeley first registered the domain name sleepspot.com on July 30, 1999.

* NameMedia registered sleepspot.com on October 15, 2003. At that time, Neeley's registration of this domain name had expired.

* A domain name consultant at NameMedia sent an e-mail to Neeley on November 29, 2007, requesting that Neeley submit documentation substantiating his claim to eartheye.com. Neeley did not comply with the request for documentation. At that time, NameMedia knew nothing of any trademarks owned or claimed by Neeley.

* Neeley sent an e-mail to NameMedia on January 26, 2009, in response to a mass-mailed e-mail advertisement announcing a "Winter Sales Event" being held by NameMedia's advertising department. The mass-mailed advertisement bore the name and e-mail address of Jason Miner ("Miner"), Vice President of Sales for BuyDomains, NameMedia's domain sales division, but it was automatically generated to thousands of recipients from NameMedia's sales database. Miner knew nothing about Neeley, or any trademarks owned or claimed by him. Neeley received the e-mail because on February 7, 2008, he had registered with NameMedia via its online interface to receive information regarding eartheye.com.

* In his January 26, 2009, e-mail, Neeley stated no facts

except that his registration of eartheye.com had expired while he was in a coma.

* On February 13, 2009, Erik Zilinek ("Zilinek"), Legal Counsel for NameMedia, wrote Neeley, telling him that if he wanted to negotiate a mutually-agreeable price for the registration of eartheye.com, he should contact NameMedia's sales team.

* Neeley's only use of sleepspot.com was for an online hotel reservation service. The domain name was intended to convey the message that the service provided a "spot to sleep," and the name is descriptive of the service which it was used to identify or advertise.

* NameMedia had no business relationship with Google prior to November, 2006.

* No Google advertisements appeared on eartheye.com or sleepspot.com before April, 2006. The last time any Google ads appeared on eartheye.com was April 1, 2009. The last time any Google ads appeared on sleepspot.com was January 15, 2010. In response to Neeley's lawsuit, Google placed both domains on its "fail list," which prevents any Google ads from being served to those domains.

4. Both NameMedia and Google move for summary judgment on Neeley's claims under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), **15 U.S.C. § 1125(d)**. NameMedia contends that Neeley cannot prove it had a bad faith intent to profit from any trademark he owned; cannot establish his claim as to sleepspot.com because it

is not a distinctive mark; and cannot establish his claim as to eartheye.com because he abandoned any common law trademark he may once have had in that name. NameMedia further contends that, if it is not entitled to summary judgment on this claim, it is entitled to summary judgment limiting Neeley's damages to the statutory minimum of $1,000 per claim.

Google contends that it had no relationship with NameMedia at the time of the wrongs alleged by Neeley, and thus cannot have conspired with NameMedia to cybersquat the domain names.

5.  The statute in question, **15 U.S.C. § 1125(d)**, provides in relevant part as follows:

> A person shall be liable in a civil action by the owner of a mark. . . if, without regard to the goods or services of the parties, that person . . . has a bad faith intent to profit from that mark . . . and . . . registers, traffics in, or uses a domain name that . . . in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark. . . .

As can be seen from its text, this statute protect marks[2], not domain names. A trademark is "any word, name, symbol, or device, or any combination thereof -- (1) used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." **11 U.S.C. § 1127**. A domain name is "the 'address' at which a computer user accesses a website on the Internet." **Coca-Cola v. Purdy**, **382**

---

[2]"Marks" includes both trademarks and service marks.

**F.3d 774, 777 fn. 2 (8th Cir. 2004).**

It is only where a domain name infringes on a mark that the ACPA comes into play, as explained in **Purdy**:

> Both the common law and Congress have provided protection to the holders of recognized trademarks to prevent others from appropriating or copying them and taking advantage of the owner's good will for their own benefit. Congress enacted the Lanham Act over fifty years ago to protect the value of trademarks by encouraging their registration and to provide a federal cause of action to prevent their misappropriation. One legislative purpose of that act was to ensure that "where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats."
>
> The development of the Internet created new areas of concern, and in 1999 Congress passed the Anticybersquatting Consumer Protection Act (ACPA) in order to prevent misappropriation of trademarks by stopping conduct known as "cybersquatting." In the ACPA Congress added section 43(d) to the Lanham Act and defined cybersquatting as registering or using with a bad faith intent to profit a domain name that is confusingly similar to a registered or unregistered mark or dilutive of a famous mark.

**382 F.3d at 778** (internal citations omitted).

6.   In order to determine whether there is a genuine issue of disputed material fact on Neeley's cybersquatting claims, the first issue to be addressed is whether his trademarks were distinctive -- and, therefore, protectible -- when NameMedia registered the domain names associated with them.

Trademarks are categorized as generic, descriptive, suggestive, or arbitrary. "Generic and descriptive marks are generally not protectible. Suggestive and arbitrary marks are

-6-

inherently distinctive and protectible." **Schwan's IP, LLC v. Kraft Pizza Co.**, 460 F.3d 971, 974 (8th Cir. 2006).

These different classifications of marks have been explained as follows:

> A generic mark refers to the common name or nature of an article, and is therefore not entitled to trademark protection. A term is descriptive if it conveys an "immediate idea of the ingredients, qualities or characteristics of the goods," and is protectible only if shown to have acquired a secondary meaning. Suggestive marks, which require imagination, thought, and perception to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks, are entitled to protection regardless of whether they have acquired secondary meaning.

**Frosty Treats, Inc. v. Sony Computer Entertainment America, Inc., 426 F.3d 1001, 1005 (8th Cir. 2005)** (internal citations omitted).

7. It is undisputed that "sleepspot" is descriptive of the service which it was used to identify or advertise, and it is, therefore, not protectible unless it has acquired secondary meaning. Secondary meaning can be proven "by showing that through 'long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others'." **B & B Hardware, Inc. v. Hargis Industries, Inc., 569 F.3d 383, 389 (8th Cir. 2009).**

In his Amended Complaint, Neeley contends that "SleepSpot.com *was going to be* the next great Internet place to find a 'Spot to Sleep' and *would make* celebrities feel embarrassed to advertise for

-7-

a competitor. SleepSpot.com *was poised* to earn millions each year as will be shown in evidence." (Document #14, italics added). In his deposition, Neeley testified that "I was *wanting to use* it to sell spots to sleep," "it *will change* the way reservations are done online," and "it *could overnight be* the answer to how to reserve a room online." (Document #250-5, italics added.)

The future tense of both Neeley's allegations and his testimony indicates that "sleepspot" had not yet reached the level of recognition necessary to create a jury issue as to secondary meaning. "Sleepspot" was, therefore, not distinctive or protectible when NameMedia registered sleepspot.com.

8. With regard to "eartheye," neither defendant offers any evidence as to its status as a trademark, and the Court finds that a jury issue exists as to whether it was protectible when NameMedia registered eartheye.com.

9. The Court next considers whether there is a genuine dispute about whether NameMedia or Google had a bad faith intent to profit from the registration, trafficking, or use of the mark "eartheye."

The ACPA lists nine nonexclusive facts that bear on the bad faith issue, five of which are indicia of bad faith. They are:

(a) intent to divert customers from the mark owner's online location for improper purposes;

(b) an offer to transfer the domain name for financial gain without having used it for the bona fide offering of goods or

-8-

services;

    (c)  the giving of false or misleading information when applying for registration of the domain name, or failure to maintain accurate contact information;

    (d)  the registration or acquisition of multiple domain names known to be identical or confusingly similar to distinctive or famous marks, without regard to the goods or services of the parties; and

    (e)  the extent to which the mark in question is distinctive or famous.

**15 U.S.C. § 1125(d)(1)(B).**

    10.  The evidence relating to the bad faith issue is as follows:

    *   Neeley first registered the domain name eartheye.com on April 17, 1997.  According to the "domain history" maintained by Domain Tools, LLC, the Registrant was Earth Eye Images, whose Technical Contact was Neeley. (Document #250-3)

    *   In his Complaint, Neeley alleged that eartheye.com "was widely used in an identifying sense in relation to the Plaintiff's photographic art and commercial photography." (Document #3)

    *   In the Addendum to his Complaint, Neeley alleged that he "had used eartheye.com since the [sic] 1997 for his photo studio." (Document #8)

    *   Neeley was involved in a catastrophic automobile accident on September 3, 2002.  He has done only a few photography jobs

since the accident. (Document #250-5)

\*   NameMedia registered <u>eartheye.com</u> on July 2, 2003.  At that time, Neeley's registration had expired.

\*   On January 26, 2009, Miner of BuyDomains sent an e-mail to Neeley, advertising "spectacular discounts" at a "Winter Savings Event," and suggesting "call us now to get eartheye.com or any other domain in our inventory!" (Documents #250-4 & 250-7)

\*   A letter from Zilinek, Legal Counsel for NameMedia, to Neeley, dated January 30, 2009, stated that "NameMedia and its subsidiaries register and offer for sale domain names that have expired and/or have become available to the public and they do so in good faith.  NameMedia's policy is to register and maintain only domain names that incorporate common acronyms, words, or phrases and/or descriptive terms for which the available evidence suggests no single party has exclusive rights."  The letter further states that searches of databases maintained by the United States Patent and Trademark Office, the World Intellectual Property Organization, and the Office for Harmonization in the Internal Market did not reveal any registration for a trademark spelled "earth eye" or "eartheye." (Document #250-13)

\*   In an e-mail from Neeley to Zilinek, dated February 3, 2009, and apparently in response to Zilinek's letter, Neeley stated "<*eartheye.com*> is listed on my business letterhead and was included on invoices I used to bill Wal-Mart. . . . The use of Earth Eye Images by myself can be traced uncontrovertibly to

-10-

5/5/1992." Neeley made then, and makes now, no representation that "eartheye" was registered with any trademark registration organization. (Document #250-14)

*   On April 6, 2009, eartheye.com was sold to a company that does topographical mapping and aerial photography. (Document #250-5)

*   Neeley testified that he considered eartheye.com of value to himself now only as "part of my -- my ancient history," and wanted to have it back "as a forwarding domain, but I do not intend to use it to further my art." He plans to use "Curtis Neeley" or "the Curtis Neeley Foundation" to advertise his photographic art, and to use "eartheye" "as an alias also, but -- as a historical perspective on the art I do, but other than that, no." He does not intend to use "eartheye" to advertise any photography services in the future. (Document #250-5)

*   No Google advertisements appeared on eartheye.com before April, 2006, or after April 1, 2009.

11. The foregoing evidence, even when viewed in the light most favorable to Neeley, does not favor a finding of bad faith on the part of NameMedia.

(a) There is no evidence of intent to divert customers from Neeley's website, eartheye.com. Because it was used only in Neeley's photography business, it would not have been in use starting from the date of Neeley's catastrophic accident in September, 2002, and Neeley's registration of the domain had lapsed

-11-

when NameMedia acquired it in July, 2003.

(b)  There was an offer to transfer the domain name for financial gain without having used it for the bona fide offering of goods or services.  This is not indicative of bad faith, however, in light of evidence that NameMedia is in the business of buying and selling domain names.  The evidence shows that NameMedia seeks to profit from such buying and selling, not from the fact that any protectible trademarks are associated with the domain names it trades in.

(c)  There is no evidence that NameMedia gave false information when applying for registration of the domain name, or failed to maintain accurate contact information with regard to it.

(d)  There is no evidence of NameMedia registering multiple domain names known to be confusingly similar to distinctive or famous marks.  NameMedia's stated policy -- and there is no evidence to suggest this is not its actual policy -- is to register only domain names that have expired or become publicly available, and only domain names that incorporate common acronyms, words, or phrases and/or descriptive terms for which the available evidence suggests no single party has exclusive rights.

(e)  There is no evidence one way or the other about whether the mark "eartheye" is distinctive.

Courts that have found bad faith under the ACPA have been presented with conduct much more egregious than that shown by the evidence here.  For example, in **Purdy**, the defendant registered

domain names like drinkcoke.org and mypepsi.org, then used them to distribute anti-abortion propaganda.  In **DSPT International, Inc. v. Nahum**, **624 F.3d 1213 (9th Cir. 2010),** the defendant held a former employer's domain name hostage to leverage favorable resolution of a business dispute.  In **Newport News Holdings Corp. v. Virtual City Vision, Inc. --- F.3d ---, 2011 WL 1467183 (4th Cir. 2011),** the defendant stopped using its domain name newportnews.com to carry information and advertising about the town of Newport News, Virginia, and started using it to carry advertising about women's clothing, thus profiting from its similarity to the domain name newport-news.com used for many years by the plaintiff women's clothing company.

Unlike these cases, in the case at bar the statutory factors relevant to a finding of bad faith with regard to NameMedia are either absent or completely neutral.  The Court finds that there is no genuine issue of disputed fact with regard to whether NameMedia had a bad faith intent to profit from the mark "eartheye" when it purchased eartheye.com.  That being the case, Neeley's cybersquatting claim against NameMedia fails, and the Court will grant the motion for summary judgment as to that claim.

12.  There is likewise no genuine dispute of material fact with regard to the issue of whether Google showed a bad faith intent to profit from use of the mark "eartheye."  (Neeley does not allege that Google registered or trafficked in the domain name eartheye.com.)

(a) There is no evidence that Google intended to divert customers from Neeley's website, eartheye.com. The evidence with regard to Google's use of the website is that it placed ads there between April, 2006, and April, 2009, long after Neeley had ceased using the domain name.

(b) Google did not offer to transfer the domain name for financial gain without having used it for the bona fide offering of goods or services.

(c) Google did not register the domain name.

(d) There is no evidence of Google registering -- or trafficking in or using -- multiple domain names known to be confusingly similar to distinctive or famous marks.

(e) There is no evidence one way or the other about whether the mark "eartheye" is distinctive.

The paucity of evidence here simply would not support a cybersquatting claim against Google.

13. Under Arkansas law, a civil conspiracy is a combination of two or more persons to achieve a purpose that is unlawful or oppressive, or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another. **Chambers v. Stern, 347 Ark. 395, 404, 64 S.W.3d 737, 743 (Ark. 2002).** Civil conspiracy is an intentional tort, "requiring a specific intent to accomplish the contemplated wrong." *Id.*

In the case at bar, Neeley contends that the unlawful purpose

of the alleged conspiracy was cybersquatting the domain names eartheye.com and sleepspot.com. Because the Court has determined that Neeley has no valid claim that either NameMedia or Google violated the ACPA, it follows that there can have been no conspiracy to do so. Google's motion for summary judgment on this claim will be granted.

14. Google has also moved for summary judgment on Neeley's claim of intentional infliction of emotional distress, contending that such a claim is pre-empted by the Communications Decency Act ("CDC"), **47 U.S.C. § 230(c)(1),** and that it fails as a matter of law.

Intentional infliction of emotional distress, otherwise known as "outrage," is an Arkansas tort, the elements of which are as follows:

> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community; (3) the action of the defendant were the cause of the plaintiff's distress; (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

**Key v. Coryell**, **86 Ark.App. 334, 343, 185 S.W.3d 98, 105 (Ark.App. 2004).** The Arkansas courts take a "narrow view" of the tort, and require "clear-cut proof" to establish each element. **Cesena v. Gray**, **2009 Ark. App. 143, 316 S.W.3d 257, 259 (Ark.App. 2009).**

**Section 230(c)(1)** states that "[n]o provider or user of an

-15-

interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  **Subsection (e)(3)** provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Google's argument appears to be that it is an interactive computer service provider, and that for it to be liable for outrage, it would have to be deemed the publisher of the information of which Neeley complains, which would violate **§ 230(c)(1)** and **(e)(3)**.

The difficulty with this argument is that Google failed to offer the Court any evidence that it is an interactive computer service provider.  It relied entirely on the holdings of several cases, which of course are not evidence.  The Court turns, therefore, to the argument that this claim fails as a matter of law.

Neeley's outrage claim is based on allegations that NameMedia and Google have conspired to allow, and are currently allowing, minors to have access to nude photographs taken by Neeley, while contending that such access was allowed by Neeley himself.

Magistrate Judge Erin L. Setser conducted an evidentiary hearing on a motion in which Neeley sought injunctive relief related to his outrage claim. Following that hearing, Judge Setser filed a Report And Recommendation in which she reported that Neeley testified (a) that he took the photos in question; (b) that he uploaded them to the internet; and (c) that they are accessible to

minors on sites other than Google because of actions taken by him. She reported that Neeley conceded that he could remove the photographs himself, but had chosen not to do so.

Neeley made various objections to Judge Setser's Report And Recommendation, but he did not object to her report of this testimony, which is fatal to his outrage claim.  Neeley can hardly be heard to complain that the conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community, when he engaged in it himself.  Nor can he convincingly claim that Google caused any distress he suffered as a result.  And -- given that he could cure the problem by his own conduct -- there is no genuine dispute about whether any emotional distress he sustained was so severe that no reasonable person could be expected to endure it.

Because there is no genuine dispute about several of the material facts necessary to prove Neeley's outrage claim, the Court will grant summary judgment to Google on that claim.

15.  For the reasons set forth in this Order, Neeley's claims against Google and NameMedia will be dismissed with prejudice, leaving for trial the week of July 11, 2011, only NameMedia's counterclaim against Neeley.  The Court's Final Scheduling Order remains in effect with respect to the trial of this claim.

**IT IS THEREFORE ORDERED** that **Google Inc.'s Motion For Summary Judgment** (document #236) is **granted**, and Neeley's claims against Google Inc. are **dismissed with prejudice**.

**IT IS FURTHER ORDERED** that NameMedia, Inc.'s **Motion For Partial Summary Judgment** (document #249) is **granted,** and Neeley's claims against NameMedia, Inc., are **dismissed with prejudice**.

**IT IS SO ORDERED.**

                                               /s/ Jimm Larry Hendren
                                               **JIMM LARRY HENDREN**
                                               **UNITED STATES DISTRICT JUDGE**